**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No: 21-CR-720 (RDM)** |
| **v.** | |
| **EZEKIEL KURT STECHER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ezekiel Kurt Stecher to three months of imprisonment, at the midpoint of the applicable Guidelines range, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100.

## I.    INTRODUCTION

The defendant, Ezekiel Kurt Stecher, a 48-year-old farmer, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is

Stecher pleaded guilty pursuant to a plea agreement to one count of Civil Disorder, in violation of 18 U.S.C. § 231. As explained in more detail below, a sentence of three months of incarceration, at the midpoint of the applicable Guidelines range, is appropriate in this case for multiple reasons. First, Stecher directly contributed to one of the most violent confrontations between rioters and the police on January 6—the battle for the Lower West Terrace Tunnel—including by entering the tunnel on three different occasions, by aggressively haranguing the officers who were trying to protect the Capitol building, and by participating in the mob's concerted "heave ho" push to overtake the police line in the tunnel. Second, Stecher joined the mayhem in the tunnel despite knowing full well that a violent riot was afoot.  Even before reaching the Inaugural stage and the tunnel, Stecher had already witnessed violent confrontations between rioters and the police on the West Plaza. Undeterred, he repeatedly reentered the tunnel despite having observed, up close, other rioters in the tunnel assaulting the officers, impeding the officers with strobe flashlights, spraying chemicals at the officers, throwing objects into the tunnel, and robbing the officers of the very shields that were supposed to ensure the officers' safety. Third, even after being sprayed with OC spray, Stecher continued to rile up the mob on the Inaugural stage, including by telling other rioters on his way out of the tunnel, "If we can't push them, drag 'em!"

---

also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.     **FACTUAL BACKGROUND**

A.      **The January 6, 2021 Attack on the Capitol**

The government refers the Court to the Statement of Offense in this case, *see* ECF 48, for a summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.      **The Breach on the West Plaza and Battle in the Lower West Terrace Tunnel**

Stecher was directly involved in two of the most critical confrontations that took place on January 6: the breach of the West Plaza and the battle between rioters and police in the Lower West Terrace Tunnel.

1.      *The Breach on the West Plaza*

At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which is connected to the United States Capitol Building via the Pennsylvania Walkway. By 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the mob jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with Capitol Police officers at the first manned barrier. Less than a minute later, the outnumbered police officers in and around the barrier were shoved out of the way by the mob. By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, flooding the area known as "Lower West Plaza."

For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment

3

and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.

After former President Trump ended his speech at the Ellipse at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to Capitol officers' calls for help began broadcasting a dispersal order to the crowd. Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.

By 2:28 p.m., with openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front, and a general retreat was called. *See* Image 1. For the next several minutes, many police officers retreated to the Capitol Building through the stadium-style stage that was being built in preparation for the January 20 Inauguration. *See* Image 2.  Large numbers of rioters followed closely behind them.

 

*Image 1 (West Plaza at 2:28 p.m.)*          *Image 2 (West Plaza at 2:34 p.m.)*

2.      *The Battle in the Lower West Terrace Tunnel*

On January 6, the Inauguration stage was connected to the Capitol Building via a 10-foot-

wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.



*Image 3*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Capitol Police and MPD officers were arrayed inside the doorway guarding the

entrance.

At approximately 2:42 p.m., rioters broke the windows to the first set of doors inside the Lower West Tunnel, and police officers responded by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, attacking police with batons, poles, chemical spray, bottles, and other items.  Officers created a line in the doorway to block the rioters and fought back with batons and OC spray.  The battle for control over Lower West Tunnel and the Terrace beyond it continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers.

### C.     Stecher's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Stecher drove from New Jersey to Washington, D.C., to attend the "Stop the Steal" rally that was scheduled to take place at the Ellipse that day.  Stecher was wearing a green cap, blue jeans, and a dark hooded jacket with fur trim.  *See* Image 4.



*Image 4 (circling Stecher in yellow)*

After attending the rally at the Ellipse, Stecher marched with the crowd towards the Capitol Building. By 2:28 p.m., Stecher had made his way with other rioters to the West Plaza of the Capitol, where, as explained above, police officers had set up a defensive line.  At that time, violent scuffles between the rioters and the officers were occurring. Despite witnessing this violence, and despite making assertions supporting to support the police, Stecher did not turn back, even as law enforcement officers were telling the rioters to leave the area.



*Image 5 (Stecher at the West Plaza, 2:28 p.m.)*



*Image 6 (Stecher at the West Plaza, 2:29 p.m.)*

To the contrary, when the police retreated from the West Plaza, Stecher followed in the same direction, making his way to the Lower West Terrace area and, from there, to the exterior of the Lower West Terrace Tunnel.

By 2:44 p.m., Stecher stood at the entrance of the Lower West Terrace Tunnel. Despite having an unobstructed view of the mayhem that was unfolding inside that tunnel, Stecher pulled up his jacket's hood, and entered the tunnel. *See* Images 6 and 7. Shortly thereafter, when the officers in the tunnel managed to (initially) push back the crowd, Stecher was forced to retreat and momentarily exited the tunnel.



*Image 7*

Less than two minutes later, at 2:47 p.m., Stecher approached the Lower West Terrace Tunnel for a second time.[2] This time, he climbed atop a ledge near the archway, evidently to have

---

[2] The government is submitting as Ex. 1 a Capitol Police surveillance video depicting the events inside the Lower West Terrace Tunnel.

a better view of the confrontation inside the tunnel.  *See* Image 8.



*Image 8*

Stecher then stepped off the ledge and forcefully banged on the archway's wall with this hand—something he did more than a dozen time. *See* Image 9. Next, he advanced deeper into the tunnel and repeatedly yelled at the officers. When OC spray (or other irritants) filled the tunnel, Stecher used his jacket's hood to cover himself. *See* Image 10. But he did not leave. Instead, he penetrated deeper into the tunnel and aggressively harangued the police officers who were attempting to stop him and the others from illegally entering the Capitol. During these invectives, Stecher repeatedly raised his right arm and gestured toward the officers. *See* Image 11; Ex. 1 at 2:48 p.m. to 2:50 p.m.



*Image 9*

*Image 10*

*Image 11*

*Image 12*

For the next 10 minutes, Stecher remained deep inside the tunnel, near the swinging double doors leading to the Capitol Building. Around him, an increasingly violent confrontation was raging. Stecher stood within feet as other rioters assaulted the officers, attempted to impede the officers' vision with strobe flashlights, sprayed chemicals at the officers, threw objects into the tunnel, and robbed the officers of the very shields that were meant to protect the officers' safety. *See* Ex. 1 (2:49 p.m. to 2:59 p.m.). At approximately 2:59 p.m., Stecher exited the tunnel a second time.

At 3:03 p.m., Stecher stood immediately outside the archway when another rioter, who had climbed atop a ledge inside the tunnel, shouted towards the crowd: "We need fresh people. We

10

need fresh people.  Come on." *See* Ex. 2 at 4:15 to 4:25.[3] Stecher heeded the call and reentered

the tunnel for a third time.  *Id.* at 4:30 to 4:55. This time, Stecher marched directly to the front of

the line, forcefully pushing the crowd forward, toward the riot line and the metal doors leading

into the United States Capitol. *Id.* During the push, Stecher advanced all the way to the double

doors leading into the Capitol Building. *Id.* There, in concert with other rioters, he pushed again

and again other rioters into the law enforcement officers who were protecting the Capitol doors as

part of a collective "heave ho." *See* Ex. 2 at 4:50 to 5:40; Ex. 3 at 12:20 to 13:00.[4] Immediately in

front of him, other rioters were fighting police in the doorway, trying to push and pull the officers

out of the way to clear a path for rioters to enter the Capitol. *Id.*

 

*Image 13 (screenshot: Ex. 2 at 4:42)*              *Image 14 (screenshot: Ex. 3 at 12:46)*

---

[3] The government submits as Ex. 2 a video recorded by this rioter from inside the tunnel on January 6, 2021. The video is available at https://archive.org/download/YAR5dKXrePW4982zH/YAR5dKXrePW4982zH.mpeg4.

[4] The government submits as Ex. 3 an open-source video recorded by another rioter inside the tunnel on January 6, 2021.  The video is available at https://www.youtube.com/watch?v=qc0U755-uiM&t=167s.

To prevent Stecher and the other rioters from breaching the Capitol, the officers sprayed the mob with OC spray. *See* Ex. 2 at 5:33 to 5:44; Ex. 3 at 13:15 to 13:25.



*Image 15 (screenshot: Ex. 3 at 13:19)*

Stecher, who stood near the front of the line, was immediately affected. Within seconds, he began making his way back out of the tunnel, visibly struggling with the effects of the spray. *See* Image 16; Ex. 2 at 5:50 to 6:30. Midway through the tunnel, he poured water into his eyes. *See* Image 17; Ex. 2 at 6:00 to 6:15. Stecher ultimately exited the tunnel for a third time. As he did so, he advised other rioters, "If we can't push them, drag 'em!"  Ex. 2 at 6:25 to 6:28.

 

*Image 16 (screenshot: Ex. 2 at 5:59)*          *Image 17 (screenshot: Ex. 2 at 6:01)*

Despite leaving the tunnel, Stecher did not leave the Capitol's restricted area.  Instead, he

remained on the Inaugural stage as other rioters continued to battle with the police.[5]

On or about March 9, 2021, Stecher was arrested in connection with his actions at the

Capitol on January 6, 2021. After being advised of his *Miranda* rights, Stecher waived his rights

and agreed to be interviewed by the FBI. During the interview, Stecher admitted that he got "caught

up in it." Moreover, Stecher admitted that he believed he pushed his way up to the front of the

police line and at some point Stecher admitted that he was sprayed in his eyes by police with an

eye irritant. When asked what he was trying to achieve while at the U.S. Capitol, Stecher falsely

claimed that it wasn't for destruction, it was to be heard and that he had no violent intentions. In

---

[5] The government submits as Ex. 4 an excerpt of an open-source video recorded by another rioter
on the Inaugural stage on January 6, 2021. The video is available at
https://www.youtube.com/watch?v=rAKBMFMuJ-g&t=765.

addition, Stecher stated that he absolutely believed there was voter fraud in the 2020 election.

## III.      THE CHARGES AND PLEA AGREEMENT

On December 8, 2021, a federal grand jury returned a six-count Indictment charging Stecher with six counts, including Civil Disorder in violation of 18 U.S.C. § 231 (Count One). On June 16, 2023, Stecher was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.      STATUTORY PENALTIES

Stecher now faces sentencing on Civil Disorder, in violation of 18 U.S.C. § 231. As noted by the plea agreement and the Presentence Investigation Report (PSR), Stecher faces a maximum sentence of 5 years of imprisonment, a term of supervised release of not more than 3 years, a fine up to $250,000, and a mandatory special assessment of §100.

## V.       THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

As set forth in the plea agreement and in the PSR, Stecher's offense level computation is as follows:

### Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Acceptance of Responsibility | -2 | U.S.S.G. § 3E1.1, provided that defendant clearly demonstrates acceptance of responsibility |
| Total | 8 | |

14

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.  PSR ¶ 57. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, Stecher's advisory Guidelines imprisonment range is 0 to 6 months. Stecher's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, the Section 3553(a) factors weigh in favor of a period of imprisonment.

### A.    Nature and Circumstances of the Offense

As shown in Section II of this memorandum, Stecher's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. At the Capitol, he made his way to the front of the crowd on the West Plaza, where he witnessed violent confrontations between rioters and the police. Undeterred, after the police retreated, Stecher marched across the Inaugural stage and into the Lower West Terrace Tunnel. He reentered the tunnel on three separate occasions, each time witnessing more violence. Nor was Stecher a passive observer to that violence. Inside the tunnel, Stecher banged his hands against the archway's walls; launched into aggressive invectives against the officers; and in concert with other rioters was a part of the mob's heave ho. The fact that Stecher went into the tunnel multiple times and actively contributed to the mayhem despite knowing full well that he was going to confront police officers inside and that his actions would subject police officers to a

15

direct risk of harm places this case at the aggravated end of January 6 cases subject to similar Guidelines ranges. Accordingly, the nature and circumstances of Stecher's offense was of the utmost seriousness. They fully support the government's recommended sentence.

**B.      Stecher's History and Characteristics**

Unlike many defendants who have appeared before this Court, Stecher has a stable family life, and did not suffer any childhood trauma or abuse that might explain his decision to engage in criminal conduct. Stecher was 46 at the time of the riot. He has no excuse for his actions on that day.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Stecher's conduct on January 6 was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

16

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a sentence of incarceration. For one thing, Stecher's conduct on January 6 strongly suggests that he is unlikely to otherwise learn from—let alone be deterred by—his own prior mistakes. As noted, on January 6, Stecher had multiple opportunities to observe the violence around him—first on the West Plaza and, then, each time he entered and reentered the Lower West Terrace Tunnel. Each time, Stecher was undeterred. Each time, he chose to break the law.

Furthermore, unlike many defendants who have demonstrated extraordinary acceptance of responsibility by pleading guilty early and cooperating with the government, Stecher did not plead guilty for almost 18 months after his indictment, despite the overwhelming evidence against him. Moreover, in his post-arrest statement to law enforcement, Stecher displayed no remorse and minimized his conduct, claiming he was simply "caught up" in the riot.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

17

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases[9] provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Ronnie Presley*, No. 1:21-CR-257-RDM, as here, the defendant pleaded guilty pursuant to a plea agreement to violating 18 U.S.C. § 231(a)(3) in connection with his participation in the January 6 attack on the Capitol. Presley, who, at the time, was on probation for a prior assault conviction, joined the storming of the police line on the West Terrace and then unlawfully entered the Capitol Building. Once inside, Presley did not comply with police commands to leave and, in fact, physically resisted. When police officers attempted to clear that area, Presley again physically resisted, pulling on an officer's riot shield. Because of Presley's more extensive criminal history, and because Presley offense conduct included physical contact with the officers (and thus a 3-level enhancement under U.S.S.G. § 2A2.4(b)(1)(A)), Presley faced a substantially higher advisory range than Stecher: 10-to-16 months, as opposed to Stecher's 0-to-6 months. This Court sentenced Presley to 12 months of imprisonment, near the midpoint of the range applicable in that case. A midpoint sentence—specifically, three months—is appropriate in this Section 231 case as well.

---

[9] In addition to the two cases described in detail, the government directs the court to the cases of *United States v. Nolan Cooke*, 22-CR-52 (RCL), and *United States v. Moises Romero*, 21-CR-677 (TSC). In both of these cases, the defendants pled to the sole count of violating 18 U.S.C. § 231(a)(3) and, within a guidelines range of 8 to 14 months, received above midpoint sentences of 366 days.

This Court could also consider, for reference, the sentence Judge Chutkan imposed in *United States v. Christian Glen Cortez*, No. 1:21-cr-317-TJC. On January 6, 2021, Cortez witnessed violence on his way to the Upper West Terrace, but nonetheless entered the Capitol Building. Once inside, Cortez joined in chants and taunts directed at police officers. After spending approximately 13 minutes inside the building and being directed to leave, Cortez joined a crowd that was amassed outside the Capitol Building and attempting to prevent Capitol Police officers from securing the North Doors. Cortez also attempted to reenter the building, in defiance of the officers' orders, and was subjected to OC spray and other chemical irritants. He also repeatedly directed angry invectives at the officers. For his conduct on January 6, Cortez, like Stecher, was convicted pursuant to a plea agreement of violating 18 U.S.C. § 231(a)(3). Like Stecher, Cortez faced an advisory sentencing range of 0-to-6 months of imprisonment. Judge Chutkan sentenced Cortez to 4 months of imprisonment. A sentence of 3 months of imprisonment is appropriate on the comparable facts of this case.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); see 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." See 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

These principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Stecher must pay $2,000 in restitution, which reflects in part the role Stecher played in the riot on January 6. (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Stecher's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 112.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three months of imprisonment, three years of supervised release, restitution of $2,000, and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     *s/ Emory V. Cole*
EMORY V. COLE
Assistant United States Attorney
PA Bar No. 49136
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, D.C. 20530
Emory.Cole@usdoj.gov